[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The parties were married on April 30, 1960 in Harrison, New Jersey. The birth name of the plaintiff was Treanor. The defendant has resided in the State of Connecticut for the statutory period conferring jurisdiction on this court. The parties have never received any assistance from the State of Connecticut. The parties share four adult children, all of whom attended the trial of this case, on the invitation of their father.
The parties met while the plaintiff was teaching English at Livingson, New Jersey, High School, following her graduation from Caldwell College in 1955. After their marriage, she continued in that employment until she was forced to resign due to her pregnancy. Their first daughter was born in 1961. The plaintiff gave birth to three other children over the period of approximately eight (8) years. During that time the parties sold their home in New Jersey, moved with his employment with Union Carbide to Ohio. They resided in Ohio for three years, then moved to Kentucky, where the family remained for eleven (11) years, until 1984, when the parties moved to Connecticut, purchased land in New Hartford on which they built a home. The defendant moved to Connecticut in January of 1984, and then she followed in October, after her elementary school teaching certification was completed. The plaintiff taught school as a substitute teacher or on yearly contract in Connecticut until 1988, when she was hired for a permanent teaching position in North Stonington. She lived CT Page 8157 in a small apartment in Rhode Island, and the defendant and the children would visit on weekends, to sail.
In 1992, she was hired by the Linden, New Jersey, school system and has tenure. She is a sixth and seventh grade language arts teacher. She continues to reside in New Jersey. She plans to continue to work, and hopes that her health will allow her to do so. There is no mandatory retirement age of which she is aware, but she continues to worry about lay-off as a result of a lack of public support of the school system.
The home is a three bedroom home with a large kitchen on one and one-half acres. The parties built the home and completed it after the plaintiff moved from Kentucky. The defendant described that the plaintiff was insistent that the home be completed so that they could live comfortably. By the time they moved to Connecticut, their children were grown and virtually on their own, although one son did reside in the martial home for a period of time.
The plaintiff is just shy of her sixty-fifth birthday, and is in reasonably good health. She suffers from high blood pressure, has scar tissue on her right eye, and has some pain in her ankles. She was hospitalized after having taken Celdane with antibiotics, resulting in her emergency treatment. She has recovered from that episode.
She complained that the defendant did not always travel with her, although they did some traveling together. She testified that he was noncommunicative, and that he was verbally abusive, and degrading to her. She testified that he "trained her to live alone" insofar as they moved to new locations, and he would leave her to go to work and "be with the guys." She claimed that she never got a compliment in thirty-seven years. She took cooking lessons, and his only comment was that she did not have to be ashamed of the cooking.
She complained that she had been required to move the family several times during the course of the marriage, and that she was required to coordinate the moves. It appeared from the limited testimony concerning the early years of their marriage, that it was a rather traditional one. He was supported as the wage earner by a wife who entertained for business, maintained the homes, and was primarily responsible for the day-to-day management of the lives of the children, the family, and their social life as a CT Page 8158 couple.
In 1969, the plaintiff inherited from her father's estate approximately Twenty-five Thousand ($25,000.00) Dollars, which funds were used for a child's education at the University of Delaware. The parties also bought and sold a home in Bay Head, New Jersey. The parties had three children in college at the same time, so proceeds were used for that purpose. She took any remaining funds, about Five Thousand ($5,000.00) Dollars with her when she moved to Rhode Island when she was hired to work at North Stonington. She sold her parents' baby grand piano to augment the money that the defendant was sending her.
The defendant inherited a home with his siblings in Matasquan, New Jersey. He received that in approximately 1993 or 1994. The parties had vacationed there as a family, up to the time that she moved into the Rhode Island apartment.
In 1988, the defendant was working at J S Metals and earning approximately Sixty Thousand ($60,000.00) Dollars per year. In 1993, their son was living in the marital home with his, girlfriend, and the defendant was working in Illinois for the successor company to J S Metals.
On cross-examination, the plaintiff testified that she left the marital home because of the employment opportunity. She testified that she waited to bring the action for dissolution of marriage because of her concern about money, her future, and his continuing lack of attention to her. She agreed that she was unhappy in the marriage while they lived in Kentucky. She claimed that she was often left alone with the children while he pursued his own interests.
She was questioned concerning her real intentions when she moved from the marital residence in 1988 to take the North Stonington job. The inference the defendant would like the court to draw is that she manipulated the defendant for financial gain, by remaining in the marriage while she prepared for an independent future.
The plaintiff agreed that she had purchased back her time in the New Jersey teachers' pension system. She used approximately Twenty Thousand ($20,000.00) Dollars of marital funds to so do. The defendant claims that these funds should be counted in the marital funds available for distribution. CT Page 8159
On redirect, the plaintiff offered a letter dated September 1, 1995, from the children to their mother. (Pl. Exh. 7).
Megan O'Brien, the parties oldest child, who is currently thirty-five (35) years old, testified on behalf of her father. During the early eighties, while she was in college, the witness testified that her mother expressed her dissatisfaction with the marriage, and talked about divorce. Apparently their mother talked frequently with the children about her unhappiness, but they did not believe that she would actually divorce their father. Over the years, the expressions of her unhappiness were consistent, and there had been times when she told them that she had consulted an attorney, who advised that her financial circumstances would be difficult upon a divorce, based upon her lack of employment skills.
The court allowed a stipulation that the mother had often expressed her dissatisfaction with her marriage, and talked about divorce with the children.
The youngest child, Susan Houle testified that after her marriage, she had a telephone conversation with her mother wherein she told her mother that she planned to go to Connecticut to sail with her father. When the daughter asked if her mother would come to Connecticut, the plaintiff replied that she would never return to that home.
The defendant testified concerning the moves that the parties made during the early years of the marriage. He testified that the plaintiff never objected. He testified that she enjoyed an active social life, had a cleaning lady at all of their homes, and was able to enjoy her interests. At the time she accepted her teaching position in North Stonington, they had no financial difficulties and their was no financial need for her to be employed outside the home.
He is currently retired, and living in the marital home. The mortgage was paid off in 1987, prior to the time that the plaintiff moved to North Stonington. The basis for the home, he claimed to be One Hundred, Fifty-five Thousand ($155,000.00) Dollars. He lives on his pensions, social security, and an occasional consulting job. The defendant has interests in sailing, working on the property, where he has a workbench and a dark room. CT Page 8160
The defendant claimed that there was no discussion concerning her departure for her teaching job. He helped her move to take the teaching job, which was the only job she could secure, but which job was outside commuting distance. She took only her personal belongings, because she moved into a furnished apartment.
He claimed that her request that they live at the shore occurred while he was still working, and was not a request that they do that after retirement. In hindsight, he considers that request to be disingenuous. They maintained a joint checking account until 1995. At that time, he unilaterally canceled that account, and began to give her Two Hundred ($200.00) Dollars per week. He admitted that he did so without ever having talked toher about that. He also claims a credit for the Two Thousand, Seven Hundred ($2,700.00) Dollars for her expenditures over a course of two months prior to his cancellation of that account.
He did claim as well a credit for Fifty-one Thousand, Seven Hundred ($51,700.00) Dollars because, he asserts, she accepted that money under false pretenses. Had he known that she had an intention to divorce, he never would have sent her that money.
He also claims a credit of one half of Fifty-eight Thousand, Five Hundred ($58,500.00) Dollars which represents the normal and necessary expenses of maintaining the marital home during the period of 1988 to date. During that period of time, the defendant was fully employed, and earning in excess of the income of the plaintiff. Furthermore, the defendant had historically paid the primary housing expenses of this family, and never made a claim on the plaintiff for any contribution. In fact, in recognition of his sense of obligation as the major wage earner in this family, he voluntarily contributed a weekly sum of money towards his wife's support.
He recalls that he contributed his cash inheritance into the joint marital funds, but that he does not believe he shared any of the proceeds of her inheritance, but for a tuition payment to their son. He expressed with some rancor that he had paid their youngest child's wedding and college expenses, and that his wife did not contribute "a nickel."
The defendant compared their incomes, prior to the wife's working full time outside the home, and following her full time CT Page 8161 employment. He also made graphs. He further compiled pension benefits. His original comparisons had her working until age 70, while he retired at 66. The court asked him to recompute those for a retirement age of 66.
He claims that he only learned of marital difficulties when he was served with this action. He claimed that he never abused her in any way, that he did not ignore her and that he had always taken care of her. After their separation, he called her to see her, but she would always have an excuse. He was greatly shocked by having been served, and testified that his whole life had collapsed before his eyes. Later, he found out that she had been talking to the kids for years about divorce. He did not want to tell the children of the divorce action, but his wife told them. He wanted to wait until the matter was concluded.
The first time she said anything about divorce and the reasons for her actions to his face, was at the four-way conference and during testimony in this court. In October of 1995, the parties had agreed to a final distribution on some of their assets, including automobiles and some bank accounts. At that time, she had an old Honda, and thereafter she went out and purchased a new Ford Escort with what he claims were marital funds. He now claims an interest in the equity of that automobile. On cross-examination, counsel asked why that was his position in light of the pendente lite orders allowing her to retain without claim from the defendant, over Nineteen Thousand ($19,000.00) Dollars, from which she purchased the automobile. He claimed that there were still withdrawals that were not explained. There does not appear to be proof on the record of his claim that he is unable to account for Thirteen Thousand ($13,000.00) Dollars in the plaintiff's account.
Plaintiff's counsel also inquired concerning the cashing in of cash value to a life insurance policy of the defendant, and a CD, which was given to counsel to hold in escrow which apparently has been used for attorney's fees. The defendant also admitted cashing in another account in the amount of Twenty Thousand ($20,000.00) Dollars, which funds were also given to counsel for fees. The total is approximately Thirty-six Thousand ($36,000.00) Dollars. The court has serious question concerning this claim. The parties, while comfortable, certainly are not wealthy. However, there is no claim by the plaintiff that these funds are subject to a request for distribution, so the court will not comment further. CT Page 8162
He agrees that the marriage is irretrievably broken down in 1988, because of information he has since learned. He also claims that she said, ". . . (W)hat did you think was going to happen when I left?" He claims that he would not have elected maximum survivorship benefits had he known her real intentions. He also would have required her to pay expenses of the household, and not permitted her to use the joint checking account. He now does not believe that she was truthful when she said she was moving to take new employment.
He claims that not only were her statements untruthful, but that they were malicious, and that she stayed married to him to enrich herself. As a result, he feels that he is entitled to a greater share of the marital assets, and alimony.
On cross-examination, he agreed that in 1994 he lived primarily in Illinois and the parties son lived in the home with a companion, rent free. The defendant agreed that the plaintiff did not complain to him when he stopped sending her Two Hundred ($200.00) Dollars per week, in April of 1995, when he retired, and it is clear from the evidence that she did not file this action until August of 1995.
In closing argument, the plaintiff argued that she is an emotional, unorganized person, which stands in stark contrast to the personality of the defendant. The marriage was a product of its time, and the background of the parties. The plaintiff claims that the defendant would refuse to resolve issues with her, and that she continued her education and pursued a career at the time that her work as a mother was less burdensome. She complained that they had achieved much as a family, and that her contribution to the family was being minimized, both by the defendant and their four adult children.
The defendant relied on the lengthy pre-trial memorandum and did not articulate further final argument. The factual arguments in the brief do not comport with the evidence elicited at trial. In fact, the defendant did not testify concerning any dissatisfaction he had with his wife's behavior, or her volatility, or her use of mental health professionals during the course of their marriage. He never testified concerning any of the intimate details of their relationship, but rather focused on his claim that she had "misappropriated" funds, and had "defrauded" him. His testimony was consistent with her claims CT Page 8163 that she could never engage him in conversation to confront and resolve problems that she perceived, and he appeared as confident that she contributed little to the assets, while he contributed nothing to her unhappiness or the causes of the breakdown of this marriage. He denied any responsibility. He did not counter any of her complaints that when the children were little she was left in new communities to fend for herself, while he worked and did his activities with his male friends.
The court can only conclude that this pattern occurred, and that her testimony was consistent with the facts of the marriage. It appeared from the evidence that his traditional view of his marriage was that he worked and did what he wanted to do when he wanted to do it, and that all of the money that was earned was his, and that she was now "stealing" his money. Her anger was obvious. The additional insult of having their children express in a letter that their partnership only existed insofar as she was useful to him as a wife and mother and social secretary, and that she ceased being a full partner when she finished that work and began to enhance her career path, and seek employment which fulfilled her outside the home, was provincial and degrading. For her female children, one of whom is a wife and mother, to participate in denigrating the critical work of mother was unacceptable to this court. For them to disregard the value of their family life to the extent expressed not only in testimony but in spontaneous bile from the back of the courtroom, leads the court to infer that the only thing that is important to these adult children is the "almighty dollar", and that nurturing care has been relagated again to the back rooms.
To watch these children advocate their father's position with such relish, without any testimony concerning their mother's negligence, abuse or selfishness, was not helpful to his cause. They certainly did not provide the information necessary for the court to find that her conduct in the past was worthy of their treatment of her. Nor did the defendant complain that she had been a neglectful mother. This record is barren of any complaint concerning care issues over time of the children.
The plaintiff testified that she had consulted with divorce attorneys over time, all of whom warned her of the financial consequences of divorce. Their advice was correct. We do not concern ourselves with the issue of the feminization of poverty because women and children prosper after divorce. She was correct in her awareness of the precariousness of her financial prospects CT Page 8164 after divorce, when she had left the job market and limited her employability because of the mutual desire, and duty according to their value structure, to raise a family. The disruption in her career to give life to her children, and give some meaning to their life as a family, was only temporary because of her desire to continue to learn and prove herself. Now even her children condemn her for that. She is, because of her choice to delay divorce, able to support herself. Her children have been educated, and the parties have some financial security, even in the face of the end of their marriage. Had she exercised her feelings of unhappiness earlier in time, these children would have been exposed to the adversity which they do not yet understand.
The defendant has failed to prove by the preponderance of the evidence that she misled the defendant. Historically, the parties had managed their marriage with some separations during his moves, and the family moved when the defendant decided that a job change required it. The court finds that her unhappiness in the marriage was often communicated to him. Their interests were diverse, and they were companions, but there did not appear to be real depth to their attachment later in life. The defendant only in retrospect claims that he was misled. Not only did he agree to her move in 1988, he was employed thereafter outside the State of Connecticut for a one year period. The court can only find based upon the entire record, that he would have pursued the employment in Illinois whether or not the plaintiff was residing in New Hartford.
While the plaintiff made the decision to end the marriage, and while it appeared that the defendant would have accepted the status of this relationship forever, that does not prove that the plaintiff's conduct was the cause of the breakdown of the marriage, or that the personality difference that made the situation unbearable for her was "fault" within the contemplation of the statute.
Furthermore, the court finds that the course of conduct of the plaintiff did not prejudice the defendant. Had she merely remained in the family home, and enjoyed their retirement, the defendant now would be facing a claim by her for adult support and property distribution. He would certainly not be able to afford his retirement as he can now because she has taken responsibility for her life and is not reliant upon him. His claim that she engaged in a course of conduct to enrich herself CT Page 8165 is misplaced. The court finds credible the evidence that she had great fear of being alone and that she did not make a clear decision to divorce until she had tenure and knew that she could provide for herself. She has done that with cost to herself; the cost of extra work and continuing employment when many women of her socioeconomic class and generation are enjoying retirement.
The court also does not find that the claim of the defendant that the plaintiff engaged in fraudulent misrepresentation to enrich herself by staying married to him was proved. This claim requires the defendant to meet a higher standard of proof — that of clear and convincing evidence. The home that the parties owned in Connecticut was paid off in 1987, one year prior to her acceptance of a teaching position in North Stonington. If her only motivation was money, the marriage might have terminated then, while the defendant was well-employed and subject to the payment of periodic alimony at a rate commensurate to his employment seventeen (17) times greater than hers. Even as she became employed, and while he continued his employment, she only approached making one-half of what he earned. The court finds that she did not elect survivorship benefits solely to deprive him of those funds, but rather because of the lack of firm resolve in the appropriateness of divorce. After all, the parties were living apart, and spending some time together as a family when it suited both of them.
The court finds that there is not proven fault on the part of the plaintiff to justify the claims for relief of the defendant. This is a long term marriage, where there was unhappiness and the expectation that things would simply go on, because they were supposed to, without effort or concern about the well being of the relationship by the defendant. That does not make him at fault either. He was a product of his background, and he did his job throughout this marriage as he had been trained to do. Neither party was able to overcome the strong religious and generational pulls to accept their marriage on the one hand, or work at something better on the other hand. It is only regrettable that their children do not seek awareness of the dysfunction of the parental relationship and understand that both of their parents did what they thought was right, and were true to their children in the process. Perhaps they could accept some growth from a review of their real history, rather than the one that they idealized in the courtroom by refusing to be open to their mother's perception of what she experienced in the many years of this marriage. CT Page 8166
The court further finds that there is a compelling argument that the defendant has been forced to reevaluate his life in his retirement years, and that his disappointment in the personal relationship should not upset his hope that he continue to enjoy the interests which he has the ability to exercise in and around the marital home.
The court has reviewed the claims of the parties, the evidence, and the exhibits in this matter, in light of the statutory criteria in C.G.S. Sec. 46b-81 et seq., and the court makes the following orders:
1) ALIMONY: Neither party shall pay or receive alimony from the other. The defendant has adequate funds to support himself and the marital home without contribution from the plaintiff. She is just recently taking full responsibility for her day-to-day financial support, and is able to meet her needs without contribution from the defendant. She has demonstrated her ability, and does not have health issues which prevent her from continuing her employment. The defendant certainly could utilize his resources to do more consulting work, or could achieve part-time employment with his many skills if he felt the need, either for more involvement with others or for more income.
2) HEALTH INSURANCE: The parties shall be responsible for their own health insurance, and their own unreimbursed medical expenses. If the defendant desires to make an election pursuant to COBRA to be covered by the wife's health insurance, she shall cooperate and any cost of that election shall be borne by the defendant.
3) BANK ACCOUNTS, STOCKS, MUTUAL FUNDS: The parties shall divide equally all such accounts presently in their possession. It appears that the evidence is not conclusive as to the claim of the defendant that there is a failure on the part of the plaintiff to account for approximately Thirteen Thousand ($13,000.00) Dollars in one account. However, the defendant's position at the commencement of trial was that that figure was well over Forty Thousand ($40,000.00) Dollars, which was adjusted downward with some effort between counsel. Clearly the claims for reimbursement of funds expended by the defendant for the marital premises while he was gainfully employed and living in the home or allowing their son to live in the home rent free is not persuasive. The gravamen of his claim might have occurred after CT Page 8167 his retirement while she increased her earnings, but that was not the argument of the defendant. He angrily wanted to be paid back for items that were legitimate expenses for himself.
4) PENSIONS: The parties shall equalize their pensions and IRA's as to present value, and equally divide those sums, by QUADRO, so that there will be no tax penalty involved.
5) REAL PROPERTY: The defendant shall retain all of his right, title and interest in and to property he inherited in Matasquan, New Jersey, free and clear from any claim from the wife. The court finds that his retention of his one-quarter interest with other members of his family is appropriate in light of all of the orders herein.
The parties shall retain their respective interests in and to the marital property in New Hartford, but the defendant shall have the right to exclusive use thereof. He shall continue to be responsible for all of the maintenance, taxes, and homeowners insurance on that property, and shall make those payments in a timely manner. He shall hold the plaintiff harmless from those obligations, and any payments she makes to facilitate the safe upkeep of the premises shall be deducted from his share of any proceeds should the house be sold. He shall commit no waste to the property. If he is delinquent in the payment of those expenses of maintenance, the home shall be placed on the market and sold.
The parties shall share any net equity realized from the sale of the subject property, which shall occur if the home ceases to be the primary home of the defendant. That shall be defined as his absence for work or other reason from the State of Connecticut for more than six (6) months, his establishment of any other residence, for part-time or retirement living or work-related living. The house also shall be sold or, at the defendant's option, he may purchase the interest of the plaintiff, upon the remarriage of the defendant. That interest shall be one-half of net equity after deduction of encumbrances only, without deduction for sales commission, insofar as there would be no sales commission if he elects to buy out her share. The plaintiff shall be entitled to move for the sale of the home upon the disability of the defendant, or upon her own disability, requiring special care, or assistance in living. That must be certified by two physicians who are treating her. CT Page 8168
6) PERSONAL PROPERTY: The parties shall retain the property presently in their respective possession, but for the list of personalty appended to the plaintiff's claims for relief. Those items shall be retrieved by her from the marital residence within sixty (60) days. Each party shall retain their own automobiles and cooperate with any motor vehicle transfer of documents which may be required.
7) DEBTS: The parties shall be responsible for the debts listed on their financial affidavits and hold the other harmless therefrom. They shall further be responsible for their attorneys fees in connection with this matter.
Judgment shall enter dissolving the marriage of the parties on the grounds of irretrievable breakdown. The plaintiff shall have restored to her her birth name of Treanor. Judgment shall enter consistent with this opinion.
DRANGINIS, J.